## Rudd, et al. v. Gates, et al.

(Decided May 10, 1921.)

## Appeal from Todd Circuit Court.

1. Trusts—Constructive Trusts.—When a devisee enters into a parol agreement with a devisor to receive, hold and dispose of the devised property in a given way a constructive trust arises which equity will enforce even though the testamentary paper purport to give the property absolutely to the devisee.

2. Trusts—Parol Evidence Sufficient to Establish.—Parol evidence alone, if clear, positive and convincing, will suffice to prove an apparently absolute devise of property a mere trust.

3. Trusts—Constructive Trusts—Statute of Frauds.—The statute of frauds cannot be interposed to defeat a constructive trust because it rests entirely for its establishment on parol evidence.

SIMS, RODES & SIMS and S. W. FORGY for appellants.

S. Y. TRIMBLE and J. R. MALLORY for appellees.

OPINION OF THE COURT BY JUDGE SAMPSON—Affirming.

The last will of John E. Patton, who died in 1911 domiciled in Todd county, reads as follows:

"I, John E. Patton residing in Elkton, Ky., do make this writing as my last will and testament. First. It is my desire that as soon after my death as practicable that my executrix shall pay my just debts that I may be owing at the date of my death. Second. I will and bequeath to my wife Susan M. Patton all of my property real and personal without any restrictions or conditions to be hers absolutely to enjoy and dispose of as as she may desire. Third. I appoint my wife Susan M. Patton executrix of this will and request the judge of the Todd county court to permit my said wife to qualify as executrix of this will without being required to execute bond.

"JOHN E. PATTON."

He had no children, but he left surviving him a widow, Susan M. Patton, who died before the institution of this action, and several nieces, who are the appellees herein and were plaintiffs in the court below.

He owned at the time of his death personal property alleged to have been of the value of $15,000, and a large valuable farm. The will above copied was executed by him about two months before his death, and at a time when he was in failing health. It is not attacked or con-

tested in any way, but appellees, Mrs. Sallie A. Gates and others, commenced this action soon after the death of Mrs. Patton, the sole devisee, in 1918, to have a constructive trust declared to exist under and by virtue of the will and an alleged oral agreement made between the devisor, John E. Patton, and his wife and sole devisee, Mrs. Susan M. Patton, immediately before the execution of the will, by which agreement it is averred that Patton devised all his property to her to be by her held and used in any way she should desire and at her death the residue of the estate to be devised by her to his collateral heirs, one-half, and the balance to her collateral kindred, and that she entered into such agreement with him and received and accepted the trust, but after his death failed and refused to carry out the agreement and did not make a will or otherwise dispose of the property received by her under the will of her husband, thus allowing all of it to descend by statute to her kindred alone.

The petition avers that:

"In the year 1911 the said John E. Patton was in failing health and fully realized that he had not much longer to live, and he desired to dispose of his property and to divide the same equally, giving his said wife, Susan M. Patton, one-half thereof, and his own heirs at law the other half; but, at the suggestions of his said wife, Susan M. Patton, and those interested in her welfare, being desirious that his said wife should be abundantly and well provided for during the remainder of her lifetime, he concluded to give and allow his said wife, Susan M. Patton, the use and profits from all his said estate so long as she lived; and, to that end and with the intention that his said wife should have the use of his said estate during the remainder of her life, and that said estate should then be equally divided, one-half to her heirs and one-half to his heirs, the said John E. Patton made and entered into an agreement and contract with the said Susan M. Patton whereby he agreed to devise to the said Susan M. Patton the whole of his estate, both real and personal, conditioned that upon the express understanding that the said Susan M. Patton would subsequently execute her own last will and testament whereby she would devise the whole of said estate unconsumed at the time of her death in equal portions, one-half to the heirs at law of the said John E. Patton and the other half to her own heirs at law, and all of which the said Susan M. Patton agreed and promised to do; that thereupon, in compliance with

the said agreement and understanding between the said John E. Patton and his said wife, Susan M. Patton, the said John E. Patton duly executed his last will and testament whereby he devised to her the whole of his estate, both real and personal. . . . Plaintiffs allege that, by virtue of the said agreement and contract so made as aforesaid between the said John E. Patton and the said Susan M. Patton, the latter, under the terms of the will of her said husband, took title to all of said estate as trustee and in trust for the use and purpose hereinbefore named, to-wit: that she would hold, occupy and use said property during her lifetime, and that she would execute and make her last will and testament whereby upon her death she would devise one-half of the residue of all said property, real and personal, to these plaintiffs, and the other one-half thereof to her own kindred.''

The answer denies the making of the agreement and the existence of the trust, and says that the will devised the property absolutely, unconditionally and completely to Susan M. Patton who died intestate.

The chancellor entered a decree holding that Mrs. Susan M. Patton received and accepted the property as trustee for the use and benefit of the heirs at law of the testator and herself, and adjudged the plaintiffs Mrs. Sallie A. Gates, et al., appellees herein, the owners of a one-half undivided interest in and to the whole residue of the estate after the death of Susan M. Patton. From that judgment Mrs. Rudd, et al., appeal to this court.

The evidence, as is usual in such cases, is voluminous. John E. Patton was past middle life but not old when he died. His wife was about the same age when she passed away in 1918.

He had contemplated the making of a will for several years according to some of the evidence. At least one witness testified that Patton had talked to him about making a will as long as twelve or fifteen years before the will in question was made, but at that time he did not want his wife's people to have any of his estate, but intended to give a share of his property to the church of which he was a member. Later he was persuaded to give up this idea and to devise half of his property to his collateral kindred and give the balance to his wife's people.

Only a few days before the will was made a neighbor and intimate friend asked Patton if he had made a will, and the inquiry started a conversation in which the wit-

ness says Patton told him he wanted to make a will and give half of his property to his own legal heirs, naming them, and the balance to the heirs of his wife. Within a few days thereafter Patton again talked to the same witness about making a will and asked him to have Mr. Perkins, cashier of the bank, to come to Patton's house and draw his will. The witness told Perkins what Patton had requested and Perkins and the witness called at the house of Patton on the date of the will for the purpose of preparing the testamentary paper.

When they were in the Patton home Patton told Perkins why he wanted him to come to the house and also the substance of the will which he desired Perkins, who was used to preparing such papers, to put in the paper. Patton said to him in substance that as he (Patton) had no children to whom to give his property he had decided to give half of his property to his nieces, whom he named, and the balance to the heirs of his wife. Whereupon Perkins, the draftsman, suggested to Patton that he will all his property to his wife for her use during life and let her make a will giving half to his heirs and the balance to her people, which suggestion was followed after a brief consultation by Patton with Mrs. Patton, whom Patton at the time announced had agreed to the arrangement.

The witness Miller, who testified to these things, was also a witness to the will. His testimony on this point is as follows:

"Q. Did you ever talk to him at any time about whether he had a will—about making a will? A. Well, yes. Q. How long was that before he died? A. Well, I really don't know just how long it was, but it was some time in that year; it may have been in the early part of the year; I think it was. Q. Do you remember how you happened to speak to him about it? A. Well, yes, I think so. Mr. George Rudd asked me to talk to him to see if he had made a will. That was how I ever came to name it to him in any shape, form or fashion. Q. Did you make any suggestion to him about what disposition he ought to make of his property, or anything of that sort? A. He told me in the first conversation that—no, it was in the second conversation—he said to tell Mr. Perkins to come down there; that he had decided to divide it between his heirs and his wife's heirs. He told me that at that time. Q. That was when he asked you to get Mr. Perkins to come down? A. Yes. Q. Did he want Mr. Perkins to write the will? A. Yes, sir. Q. State whether

or not they were intimate friends? A. Yes, sir, they were. Q. It was then he told you that his purpose was to divide his estate between his own heirs and his wife's? A. Yes, sir. Q. Did you and Mr. Perkins go down there the same day? A. No, sir, it was two days later. Q. When you and Mr. Perkins got there, state what disposition Mr. Patton desired to make of his property. What instructions did he give Mr. Perkins about the preparation of the will? A. He told Mr. Perkins that he wanted to get him to write his will, and I think he got him some paper, ink and pen and fixed a table for him to write on. Then he told him that he just wanted to dispose of his property and make two parts of it, half of it to his wife for the Rudd heirs and half of it to his heirs. I think he named them. I am not sure, but I think he named five. I have forgotten just who they all were. Q. State the names that he named? A. I think he named Mrs. Gates at Kirkmansville, and I think he named two of Mr. Bearden's daughters and Mrs. Chapman and Mrs. Lewis, I think. Q. He named those ladies as being his own heirs? A. Yes, sir, nieces. Q. And what provision did he want to make for them? A. He wanted them to have half of his estate. Q. Now why was not the will written just that way, Mr. Miller? A. Well, Mr. Perkins suggested— he said, in other words this: 'John, why don't you just will it all to your wife and let her make a will dividing the estate?' 'Well,' John says, 'I had never thought of it that way.' 'Well,' he said, 'that would keep any of them from ever worrying her while she is living,' and John said, 'I will go and talk to Sue,' and he got up and was gone perhaps five minutes—maybe longer—I never paid any attention to the length of time. Q. Where did he go? A. Back into the back part of the house. Q. Who was there? A. Mrs. Patton, I suppose, I didn't see her back there. Q. Was there anybody else back there? A. Nobody at all. There was nobody that I knew of. Q. He said he wanted to talk to her? A. Yes, sir. Q. On his return what happened? A. And he came back and said, 'Mr. Perkins, go ahead; me and Sue has agreed on that way of writing it and will it all to her.' Q. Well, Mr. Perkins then wrote the will as it was announced then? A. Yes. Q. And when it was completed what happened? A. When it was completed he read it over. Q. Whom do you mean read it over? A. Mr. Perkins read the will. Q. Read it aloud? A. Yes, sir. Q. State whether Mrs. Patton came in about that time? A. She came in before

he got through writing the will. She spoke to us and stood there and then he commenced reading the will directly after she came in. Q. Did she hear it read? A. Yes, sir. Q. What did Mr. Perkins then say? A. He says, 'John, it is ready to sign now.' Mr. Patton he got up and says, 'That is my will with the understanding me and Sue has got,' and signed the will. That was about all that was said about it at that time. Q. State whether or not Mrs. Patton heard this statement which her husband made? A. I suppose she did, she was standing within six or seven feet of him. Q. To whom did he address that remark? A. He looked at her when he spoke. I was sitting at the front end of the hall, and she was between me and him and Mr. Perkins was on the other side of— Q. Did she say anything in dissent? A. I don't think she said anything at all. Q. She made no response at all? A. I think not. Q. Did she in any way dissent from his statement, that they had an agreement about? A. No, sir."

The same witness, a close neighbor, went to the Patton house immediately after the sudden death of the testator while his wife was weeping and talking about her deceased husband and saying that he was the best man in the world, and that he had willed his property to her to be used as she pleased during her life, the residue to be divided between his heirs and her heirs at her death and that she had agreed to make such distribution of the property. A large crowd of neighbors had gathered at the house about the same time and several of them testified that the devisee, Mrs. Patton, stated repeatedly that he had given her all his property and she had agreed to dispose of the residue at her death by giving half to her people and half to the appellees, heirs of Patton.

The evidence overwhelmingly shows that Patton entered into an agreement with Mrs. Patton whereby he was to will her all his property, she to use or dispose of any of it as she saw fit during her life and at her death give one-half of that remaining to her family and the other half to the family of Patton. She lived seven or eight years after his death and died without making a will.

Under facts like these the courts of this country have frequently held the devisee a trustee of a constructive trust, and compelled an execution thereof. In 26 R. C. L. 1241 the rule is stated as follows:

"It is well settled by the great weight of authority that notwithstanding the statute of frauds a trust arises where, on the making of a will or thereafter, a devisee or legatee promises the testator, either expressly or impliedly by not dissenting, that he will hold for or give to another the property devised or bequeathed to him, whereby the testator is prevented from making the disposition by will which he intends or is persuaded not to alter a will already made. Under such circumstances the devisee or legatee will be declared a trustee *ex maleficio* and the trust will be enforced against him."

The cases which support this doctrine are too numerous to cite and come from the courts of last resort all over this country.

It is said that the statute of frauds prevents the enforcement of such a parol agreement as the one relied upon by Mrs. Gates and the other appellees, but we think not. Vizard Investment Co. v. York, 167 Ky. 634.

Ordinarily an express trust in real property cannot be created except by writing, but this rule has no application to constructive trusts which arise by implication of law from the fraudulent acts and purposes of the devisee in procuring the title to the real property. In discussing this question we said in the case of Taylor v. Fox, Ex. 162 Ky. 810:

"As a general rule, if an absolute devise is made, the intention of the testator that the devisee is to hold the property in trust for some one else cannot be shown by evidence other than the will itself, but an exception is made where the devisee obtains the title to property by a promise to the testator that he will hold it for another, and afterwards refuses to do so, and sets up claim to it himself. 40 Cyc. 1754-55.

"A parol trust must necessarily be established by parol testimony. In the case of Roche, et al. v. George's Exr., et al., 93 Ky. 609, this court said: 'A trust created by parol will be enforced where it is established by certain and undoubted testimony and such as to leave in the mind of the court no rational doubt as to the act of the testator.'

"In the case of Northcutt v. Hogan, 4 R. 364, the superior court held: 'In an action to enforce a parol trust concerning land or the proceeds thereof such trust must not only be clearly alleged, but, as against written instruments, must be established by clear and satisfactory testimony."

It must be remembered that the will of Patton is not attacked or contested in any way, and the parol evidence was not intended to nor does it attempt to impeach that document.

In the case of Skinner v. Rasche, 165 Ky. 113, we said:

"The rule is well settled that a contract to devise may be enforced after the death of the promisor by fastening a trust upon the property, in the hands of the heirs, devisees, personal representatives, or others holding the property with notice of the contract or as volunteers. 36 Cyc. 736, and cases cited; see also Teske v. Dittenberner, 70 Neb. 544, 98 N. W. 57, 113 A. S. R. 614.''

A case in some of its aspects like the one before us is Becker v. Neurath, 149 Ky. 421. In that case Becker conveyed real property to his second wife on her parol agreement to restore it to his children at her death, but she died without so doing and her sister claimed the property against the children of the deceased. In that case we said:

"Assuming that Becker was induced to convey this property to his wife by her promise to give it to his children at her death, the legal question presented by the record is: Did this parol promise upon her part create a trust that can be enforced by his children against the person who, as heir at law of Mrs. Becker, received the property under the statute of decent and distribution, there being no creditor or other persons involved in the controversy except the children on the one side and the person to whom this property descends upon the other? . . . Here the land was conveyed to the wife without valuable consideration under an agreement upon her part that she would hold it during her life and at her death return it to the children of the grantor. The parol agreement in the case at bar was not made by the owner of the title, as in the cases referred to, but by the party to whom the owner of the title conveyed the property; and the text-books and cases, with practical uniformity, hold that an agreement such as was made between Mrs. Becker and her husband creates an enforcible constructive trust. . . . But notwithstanding this well established doctrine, it is insisted that the evidence in this case is not sufficient to support the principle contended for by appellants. Upon this point the argument is made that before equity will lend its aid to enforce a parol con-

structive trust it must be shown by satisfactory evidence that the grantor was induced to make the conveyance with the parol trust attached by the actual fraud of the grantee. Or, to put it in another way, that it must be shown by convincing evidence that the grantee by false representations or other fraudulent means, obtained the title without intending to carry into effect the express wish of the grantor in making the conveyance. That there are a few decisions supporting this contention may be admitted, but the tendency of the modern cases and the great weight of authority is to enforce a trust of this character when it is shown that it would be unconscientious to permit the grantee to hold the estate in violation of the promise, although there may be no evidence of actual fraud on the part of the grantee in obtaining the conveyance. It is true that the doctrine of constructive trusts rests upon the ground that the grantor has been induced to part with his title by fraud of the grantee, but it does not follow from this that it is necessary to show by fact or circumstance actual, intentional fraud practiced at the time by the grantee. When the grantee by act or word has induced the grantor to make the conveyance under an agreement or promise that certain parol conditions attached to it will be complied with, the law will imply a fraud from the failure of the grantee to perform the annexed conditions.''

The evidence in this case is so clear and convincing that Patton and his wife entered into a parol agreement whereby he was to and did will her all his property for her use and benefit during her life and that she, in consideration of such devise, was to give one-half of what remained at her death to his heirs, appellees herein, that we cannot but hold that a trust arose which equity will enforce by giving to those to whom Patton intended to receive it, one-half his property.

We are convinced that the trial court did not err in holding, upon the record, that Mrs. Patton received the property of her husband under the will impressed with a trust which her failure to carry out cannot defeat.

Judgment affirmed.